UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

UNITED STATES OF AMERICA

                                                    16 Cr. 350 (ARR)

        -against-

NASHWAN SAID,

                                      Defendant.

------------------------------------------------------------------------ x

## SENTENCING MEMORANDUM FOR
## DEFENDANT NASHAWN SAID

                                        MICHAEL HUESTON, ESQ.
                                        *Attorney for Defendant*
                                        16 Court Street, Suite 3301
                                        Brooklyn, New York 11241
                                        (718) 246-2900

Dated:      Brooklyn, New York
                July 16, 2018

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

UNITED STATES OF AMERICA

                     16 Cr. 350 (ARR)

    -against-

NASHWAN SAID,

              Defendant.

------------------------------------------------------------------------ x

**SENTENCING MEMORANDUM FOR
DEFENDANT NASHAWN SAID**

**A.  Introduction**

Defendant Nashawn Said places before the Court the following issues relating to his appropriate sentence pursuant to Fed. R. Crim. P. 32.

On September 11, 2017, Mr. Said pled guilty to Count Two of a two-count indictment. Count Two charges that between June 2012 and February 2016, Mr. Said together with others, used, acquired, and possessed SNAP benefits of a value of more than $100, in a manner contrary to that authorized by 7 U.S.C. § 51, and the regulations issued pursuant thereto, in violation of 7 U.S.C. § 2024(b). *See* Presentence Investigation Report ("PSR") at ¶ 1. Mr. Said's total offense level is 15; he has a Criminal History Category of I; and his Guidelines range is 18 to 24 months. *See* PSR at ¶¶ 27-36, 40, 77.

Mr. Said is a permanent resident from Yemen. He has worked consistently since immigrating to the United States and has struggled to make a better life for himself and his family. His family and friends describe him as honest, trustworthy, humble and helpful, but also as unsophisticated, not fluent in English, and too trusting of others, which led to his involvement in the offense.

For the reasons detailed below, Mr. Said respectfully requests that the Court impose a non-Guidelines sentence of a period of probation. This would be reasonable considering the objectives of 18 U.S.C. § 3553(a), including Mr. Said's history and characteristics, the nature of the offense, the need for general and specific deterrence, the need to avoid sentencing disparities, and the deportation consequence of his conviction.

Mr. Said faces deportation as a result of his conviction. *See* 8 U.S.C. § 1101(a)(43)(J); and 8 U.S.C. § 1227(a)(2)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable.") This would mean being returned to Yemen, a country at civil war, which has been described a "man-made catastrophe"[1] and "the world's worst humanitarian crisis."[2]

**B.   Comments and Objections to the Presentence Report**

Counsel submitted a letter to the Probation Department detailing the defense's objections and comments to the PSR. A copy of that letter is attached hereto as Exhibit A.

**C.   Mr. Said's History And Characteristics**

Information relating to Mr. Said's background and characteristics is detailed in the PSR at ¶¶ 45-72, his letter to the Court and his letters of support at Exhibits B and C respectively. The following discussion draws from this source material and other material where noted.

Mr. Said is a 37-year immigrant from Yemen and a U.S. permanent resident alien who resides in Brooklyn with his family. He has no criminal convictions. He is one of

---

[1] *See* Office of the High Commissioner, United Nations Human, "*Yemen: An 'entirely man-made catastrophe" – UN human rights report urges international investigation'* at: https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=22025&LangID=E.

[2] *See* United Nations, UN News, Yemen at https://news.un.org/en/focus/yemen.

2

nine children born to the marriage of Noman Said and Saydh Othman. His father owned a small grocery store in Brooklyn for several decades, while his mother was a homemaker in Yemen and later in Brooklyn. Both of his parents have diabetes, and his father has high blood pressure. Growing up, Mr. Said was raised in a lower-income household in Yemen, with his father often traveling between the United States and Yemen. Mr. Said childhood was "difficult" due to economic hardship and physical abuse. Mr. Said attended school in Sanaa, Yemen where he was a below-average student, and did not complete high school. Mr. Said is fluent in Arabic but understands only some English.

Mr. Said immigrated to the United States at the age of 20 and has since lived in Brooklyn, although since 2001, he has frequently traveled between Brooklyn and Yemen, staying in Yemen for months at a time.

As a child, Mr. Said suffered seizures, which affected his memory. He also hit his head and suffered an injury and was seen by a psychiatrist in Yemen.

Mr. Said has minor children, which he supports. All his children are healthy. But his wife Boshra Mohammed has chronic hearing loss and ear pain, and has undergone six surgeries without success.

From 2000 to 2004, Mr. Said was employed at a grocery store in Brooklyn. He was not employed prior to immigrating to the United States. Mr. Said started working at Rightway Grocery (the store involved in the offense) in 2005, and the business was transferred to his name in 2008. Mr. Said continued to work at Rightway until 2012 when he left due to issues the store had with the SNAP program, and his disagreement with his partners and family over it. Mr. Said's brother, Fawaz Said, believes that his

3

brother was taken advantage – as it relates to the SNAP benefit program – because he is "too trusting of others" and wishes the Court to understand that his brother does not know "much English," and "his [brother's] partners put the store under the defendant's name" without his brother knowing "all the consequences of having the store under his name."

Once Mr. Said left Rightway, from 2012 to 2016, he was employed at another grocery store/delicatessen in Brooklyn. While working there he had no issues involving the SNAP program. Unfortunately, he was fired from that job due to his arrest in this case. Thereafter, Mr. Said briefly worked for his family at Rightway (which no longer took SNAP benefits), and has since worked at Stanley Convenience in Brooklyn and Uber Eats. Mr. Said has filed taxes regularly.

Notably, in April 2016, while working at Rightway, Mr. Said was shot in his right hip by a customer who did not believe that the grocery store no longer accepted SNAP benefits. Mr. Said was treated in the emergency room at Brookdale Hospital in Brooklyn and released. He suffered no long-term effects from the gunshot wound.

As to the defendant's character, his brother Fawaz Said wishes Your Honor to know that his brother "is very kind, friendly, and … cares about everyone." Members of the defendants' community and former customers describe him as "very helpful", "a great friend and hard worker", "a very pleasant individual", and that "the amount of love and passion he has out into this community is beyond amazing." Other individuals mention how Mr. Said has volunteered in homeless shelters, state how well respected he is, and that he is a person who makes time "to talk and assist anyone in need." Other customers describe him as "smiling and well mannered" and "a great value to our community." While others explain, "I look forward to our conversations daily and would

be deeply saddened if he was no longer here. I would highly appreciate if you would take my words into consideration because this neighborhood can't afford to lose a man like Mr. Said, nor do we want to."

Further, since his arrest, Mr. Said has experienced stress because he is worried about the wellbeing of his family if he is deported, which, at times, has caused him to contemplate suicide. And while he has opted not to undergo mental health treatment, he is hopeful that his mental health will improve after he is sentenced. Finally in Mr. Said's letter to the Court, he expresses his regret and remorse about his conduct, stating:

> I humbly accept full responsibility for my actions. I am very sorry and I ask forgiveness. I have learned from this experience.
>
> I ask, Your Honor, to consider what a sentence to prison will have on my family. I've always worked hard and tried my best to support my family. I have worked long hours, and done my best to learn English and to be a contributing member of our society. I came to this country to start a new life for my family, so they would have opportunities that aren't available in Yemen. I did not come here to abuse the law, although I know I did. Again, I'm deeply sorry.
>
> Your Honor, I want you to understand that I stopped working at Riteway Grocery in 2012, and before then I was often absent from the store traveling to Yemen. I stopped working at Riteway because I did not agree with how the business was being run; however, I left my name on the paper work so my family could continue to operate the store. I am not a highly educated man or a sophisticated businessman. I hoped the store would be run well and right. Between 2012 and my arrest in 2016 in this case, I worked at a grocery store in Jamaica, Queens, and I had no problem following the rules of the SNAP Program. I mention this to show the contrast. I only returned to Riteway, after my arrest when there was no SNAP machine, and our family has since closed the store.
>
> Your Honor, as you know, I come from Yemen, which is suffering from a terrible civil war. The war has made

5

> Yemen a place where there are no opportunities, just horrible pain and suffering. Many thousands of people have died and cities and towns have been destroyed. So many people are refugees. I worry about my loved ones there. I hope to remain here in this country as long as I am able to, so I can continue to provide support for my family both here and in Yemen. Presently, I am an Uber driver, which allows me to do so. I truly wish my family there could emigrate here. I pray for their safety everyday. However, wherever I am, I will do my best to provide for my family and keep them safe.

**D. Offense Conduct and Adjustment to Supervision**

Mr. Said is best described as a non-violent offender with no aggravating role. The indictment lists only one overt act of SNAP fraud on June 5, 2012 involving $103.99. *See* Indictment at ¶ 14(a). While Mr. Said was the purported "owner" of Rightway Grocery from 2008, he stopped working there in 2012, and throughout its history the store had various "partners" including his co-defendant Sofyan Saeed. PSR at ¶¶ 9, 11, 21, 47. Mr. Said also spent extended periods (up to 6 months at a time) in Yemen for the remainder of the indicted period, *see* PSR at ¶ 14, which shows that the store ran without him.

Mr. Said has had no incidents while under supervision. *See* PSR at ¶ 2.

**E. Loss Amount**

Mr. Said has objected to the loss amount of $339,509.78 attributed to him based on United States Department of Agriculture redemption data and comparisons. His loss calculation should be the amount of the undercover agent's purchase of $103.99, or not more than $6,500. *See* U.S.S.G. § 2B1.1(b)(1)(B).

  *1. The Loss Table Overstates Culpability*

The PSR and the plea agreement's advisory Guidelines computation is based upon the 2016 amendments to the loss table contained in U.S.S.G. § 2B1.1(b)(1), and

6

calls for, based on the attributable loss, an addition of twelve levels to the base offense level of six. "Loss" based guidelines have been widely criticized by judges and legal scholars alike. As stated in one opinion, the guidelines "in an effort to appear 'objective' tend to place great weight on putatively measurable quantities, such as . . . [the] amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *United States v. Aldelson*, 441 F. Supp.2d 506, 509-12 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis" that the Sentencing Guidelines place in fraud cases on the amount of actual or intended loss as "patently absurd"). *See also*, *United States v. Parris*, 573 F. Supp.2d 744 (E.D.N.Y. 2008) (the economic crime guidelines are "a black stain on common sense"); *United States v. Emmenegger*, 329 F. Supp 2d 416, 427-8 (S.D.N.Y. 2004) (reasoning amount of loss is often "a kind of accident" and therefore "a relatively weak indicator of moral seriousness . . . or the need for deterrence").

We are certain that this Court is familiar with a growing swell of learned outcry against strict application of the existing economic offense guidelines, as some courts have been looking elsewhere for better approaches to economic crime sentencing in order to arrive at a sentence that is no greater than minimally necessary to satisfy the goals of sentencing and the interests of justice. *See, i.e., United States v. Faibish*, 2015 U.S. Dist. LEXIS 101200, at *5 (E.D.N.Y. July 16, 2015) ("The loss table is but one example of the seemingly mindless acceleration of penalties for economic crimes incorporated in the current Sentencing Guidelines regime"); Anello and Albert, *Rise of ABA Task Force's Shadow Sentencing Guidelines*, N.Y.L.J., April 5, 2016.

7

Significantly, the Second Circuit had occasion to consider the impact of the loss guidelines sentence calculations, concluding that the "unusualness" of that specific guideline may itself be a basis to consider a more lenient sentence. *United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016).

As the Second Circuit explained:

> We recognize that these increases complied with the Guidelines Manual. We also recognize that the Commission had the authority to construct a set of guidelines that used loss amount as the predominant determination of the adjusted offense level for monetary offenses.
>
> But the Commission could have approached monetary offenses quite differently. For example, it could have started the Guidelines calculation for fraud offenses by selecting a based level that realistically reflected the seriousness of a typical fraud offense and then permitted adjustments up or down to reflect especially large or small amounts of loss. Instead the Commission valued fraud (and theft and embezzlement) at level six, which translates in criminal history category I to a sentence as low as probation, and then let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range. This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider . . . . *Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence.*

*Id.* at 800 (internal citations omitted) (emphasis added).

It is respectfully submitted that the advisory Guidelines calculation, driven as it is by the loss amount enhancement, results in a sentence range for Mr. Said that is greater

8

than minimally necessary to address sentencing concerns and to meet the ends of justice. Accordingly, we ask for a downward variance from the advisory Guidelines range.

    *2.       The Loss Amount is Speculative*

While, "loss" need not be determined with precision; rather, the "court need only make a reasonable estimate of the loss," U.S.S.G. § 2B1.1, comment. (n.3(C)), the Presentence Report's reliance on the case agent's comparisons of grocery stores and looking at transactions involving amounts over $50, while perhaps "indicative of fraud" does not, in itself, translate to actual fraud, much less loss. *See United States v. Abiodun*, 536 F.3d 162, 167 (2d Cir.), *cert. denied* 555 U.S. 1020 (2008). Clearly, the Government and the Probation Department have relied on surmise and conjecture, which is not permitted. *See e.g.*, *United States v. Shonubi II*, 998 F.2d 84, 89-90 (2d Cir. 1993) (quantity of narcotics smuggled over eight trips by multiplying eight by the amount smuggled during the offense of conviction amounted only to "surmise" and "conjecture," and thus, was impermissible). *See also United States v. Shonubi IV,* 103 F.3d. 1085, 1092 (2d Cir. 1997) (proving the quantity of drugs by statistical and economic analysis relating to drug trafficking generally, not to the defendant specifically, did not satisfy the "specific evidence" requirement); *Simms v. United States Dep't of Agriculture Food Nutrition Serv.,* 860 F.2d 858, 862 (8th Cir. 1988) ("district court 'must reach its own factual and legal conclusions … and should not limits its consideration to matters previously appraised in the administrative proceeding'") (internal quotation marks omitted) (*quoting Ibrahim v. United States*, 834 F. 2d 52, 53-54 (2d. Cir. 1987). More must be shown, than guess work to establish loss.

9

In addition, the Guidelines states that regarding "government benefits" "loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50." U.S.S.G. § 2B1.1, comment. (n.3(F)). So the Guidelines, themselves, call for a level of precision the $50 price-point fails to reveal, as we simply do not know the amount of value obtained to make a calculation.

Finally, Mr. Said did not intend the loss amount as he informed his "partners" to stop their activities then quit Rightway. *See United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) (a preparer of fraudulent loan applications who was held accountable for an intended loss equal to aggregate amount of the requested loans should have been afforded an opportunity to persuade the court that he expected some of the loans to be denied or partially repaid); *see also United States v. Singh*, 390 F.3d 168, 194 (2d Cir. 2008) (doctor who submitted excessive bills to insurers entitled to opportunity to show subjective intent not to receive full reimbursement).

**F.      Restitution**

The PSR concludes that Mr. Said "may be" subject to 339,509.78 in restitution. *See* PSR at ¶ 86. "The purpose of restitution is to compensate victims for their losses." *United States v. Pescatore*, 637 F.3d 128, 138 (2d Cir. 2011). Loss for the purpose of setting an offense level is not the same as loss for the purpose of ordering restitution. A court's power to order restitution is limited to actual loss. *See United States v. Germosen*, 139 F.3d 120, 130 (2d Cir. 1998) (citing 18 U.S.C. § 3663(a)(1)(A)).

10

Further, under U.S.S.G. § 5E1.1:

> A restitution order may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments.

See U.S.S.G. § 5E1.1(f). The defense submits that a restitution order in the amount of no more than $6,500 is a more appropriate figure. First, as explained above, the purported loss amount is speculative. Second, Mr. Said is poor, has dependents, and is simply unable to pay a sizable amount. And third, a payment of no more than $6,500 over time, *see* U.S.S.G, § 5E1.1(e), would be sufficient and serve as a deterrent. 18 U.S.C. § 3663(a)(1)(B)(i)(II). See *United States v. Jacques*, 321 F.3d 255, 260-61 (2d Cir. 2003). *See generally United States v. Battista*, 575 F.3d 226, 232 (2d Cir. 2009).

Finally, the defense asks that the restitution amount be adjusted periodically to reflect any lowering of the figure.

**G.    Mr. Said's Sentence Must Not Be Greater Than Necessary To Achieve The Goals of 18 U.S.C. § 3553(a) and Should Take into Account His History and Characteristics**

Mr. Said's offense of conviction results in a maximum sentence of 5 years imprisonment. The Court may impose a term of supervised release of no more than three years. Mr. Said faces an advisory Guidelines range of 18 to 24 months imprisonment. He respectfully requests that the court impose a non-Guidelines sentence of a period of probation.

Even in the post-Booker era, the Sentencing Guidelines remain the Probation Department and Government's sentencing regime of choice in virtually every case.

11

However, this Court is not required to impose a sentence based on the advisory Guidelines or based on any policy of the Sentencing Commission that circumvents the specific intent of Congress. *Pepper v. United States*, 562 U.S. 476, 501 (2011). In this case, a sentence at variance with the advisory Guidelines is appropriate because the Guidelines fail to include critical factors about Mr. Said'sbackground, which Congress mandated must be included in arriving at the sentence to be imposed. 18 U.S.C. § 3553(a).

A non-Guidelines sentence is warranted here based on the factors set forth in 18 U.S.C. §§ 3553(a). Mr. Said respectfully asks the Court to take into account the following factors regarding his appropriate sentence.

First, as mentioned above in Section E, the alleged loss amount overstates Mr. Said's culpability and is specualtive.

Second, Mr. Said is aware of the seriousness of the crime he committed and will never place himself in this position again. He accepts full responsibility for his actions and understands the consequences of his conduct. He is also deeply remorseful. He has always been a productive member of society, working and filing taxes, and taking care of his family. Mr. Said continues to reflect on how his actions have hurt his family, which serves as a deterrent. The imposition of a sentence of probation, in itself, is highly likely to deter Mr. Said, and under U.S.S.G. § 4A1.3 the likelihood that a defendant will commit further offenses is an issue the Sentencing Commission views as important. Mr. Said has had no incidents while under supervision, which demonstrates he can be curtailed without incaceration.

Third, Mr. Said is a struggling husband and father with a confirmed work history. While a defendant's employment record, under the advisory Guidelines, "will warrant a departure in only a relatively few instances," *United States v. Jagmohan*, 909 F.2d 61, 65 (2d Cir. 1990), in Mr. Said's case this factor should be considered under 18 U.S.C. § 3553(a). The time Mr. Said has spent working demonstrates a level of seriousness and dedication.

Fourth, after *United States v. Booker*, 543 U.S. 220 (2005), sentencing courts must consider "the need to avoid unwarranted sentencing disparities among defendants with similar conduct." 18 U.S.C. § 3553(a)(6). Thus, sentencing disparities are now properly considered by sentencing courts in their exercise of sentencing discretion. *United States v. Florez*, 447 F.3d 145, 157 (2d Cir. 2006); and *United States v. Wills*, 476 F.3d 103, 110 (2007). Here, the Court has already sentenced related defendant Amar Saed to two years probation. *See* PSR, at p. 1. Although each individual's circumstances have unique factors, Amar Saed's sentence demonstrate that defendants in this case have circumstances that warrant such consideration, and the defense respectfully suggests that Mr. Said is similarly situated.

Fifth, Mr. Said's parental responsibilities are another powerful mitigating factor the Court should consider, especially in light of his likely deportation, which, in itself, is another mitigating factor this Court should consider. *See United States v. Chong*, 2014 U.S. Dist. LEXIS 135664, at *32-33 (E.D.N.Y. 2014) ("Critical to the determination of an appropriate sentence is the likelihood that [a] defendant will be deported as a result of his conviction. As discussed ... this basic fact is relevant to each of the Section 3553(a)(2) factors.") In this regard, it is hard to overstate the severity of the crises in

13

Yemen. According to the Office of the United Nations High Commissioner for Human Rights:

> The UN Office for the Coordination of Humanitarian Affairs (OCHA) reported that more than two thirds of the population were in need of humanitarian assistance and at least 2.9 million people had fled their homes. The [World Health Organization] reported that more than 500,000 people were suspected of having cholera due to lack of clean water and access to health facilities. Nearly 2,000 people had died of cholera since the outbreak began in 2016.[3]

Further, once Mr. Said is deported, his children will be deprived of his daily guidance and support, and sentencing him to a period of incarceration prior to his deportation would only further undermine their vulnerable position while providing no societal gain. *United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) ("the families of defendants are the intended beneficiaries of downward departure on the grounds of extraordinary circumstances relating to family responsibilities"); *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) (the potential for imprisonment to effect the destruction of an otherwise strong family unit can be a basis for a judge's discretionary departure from the range set forth in the Guidelines); and *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (same).

**F.     Conclusion**

We respectfully urge the Court to vary from the advisory Guidelines range based on the 18 U.S.C. § 3553(a) factors set forth in this memorandum and impose a sentence of probation. That is a significant life-changing penalty that amply punishes Mr. Said for his offense conduct, maintains and encourages respect for the administration of justice,

---

[3] Amnesty International Report, Yemen 2017/2018 https://www.amnesty.org/en/countries/middle-east-and-north-africa/yemen/report-yemen/.

and serves as individual and general deterrents.  It is, in short, a sufficient, but not greater than necessary sentence.

      Mr. Said respectfully reserves the right to raise additional issues, if necessary, at the time of sentencing.

Dated:      Brooklyn, New York
               July 16, 2018

                                    Respectfully submitted,

                                    ____s/_____
                                    MICHAEL HUESTON, ESQ.
                                    *Attorney for Defendant Nashawn Said*
                                    16 Court Street, Suite 1800
                                    Brooklyn, New York 11241
                                    (718) 246-2900

## DECLARATION OF SERVICE

Michael Hueston, declares under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and correct:

On July 16, 2018, I served the annexed Sentencing Memorandum and Exhibits on:

AU.S.A Alicia Washington
United States Attorney for
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201

Defense Counsel

[X]  BY ELECTRONIC CASE FILING
[ ]  BY EMAIL
[ ]  BY HAND
[ ]  BY FIRST CLASS MAIL
[ ]  BY FACSIMILE WITH PERMISSION

Dated:   Brooklyn, New York
         July 16, 2018

___s/_____
MICHAEL HUESTON, ESQ.
*Attorney for Defendant*
16 Court Street, Suite 3301
Brooklyn, New York 11241
(718) 246-2900